## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-20287-CR-MOORE/D'ANGELO

**UNITED STATES OF AMERICA**

**vs.**

**DIORI BARNARD,**

     **Defendant.**

_____ /

### REPORT AND RECOMMENDATION
### DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS CAUSE** is before the Court on Defendant Diori Barnard's Motion to Suppress filed on January 22, 2025 (DE 29).[1]  The Government filed its response in opposition on February 5, 2025 (DE 47), and Defendant replied on February 10, 2025 (DE 55).  The Court held a hearing on the Motion on February 12, 2025, at which it heard the arguments of the Parties (DE 58).  Having considered the Parties' arguments, the relevant legal authorities, and the pertinent portions of the record, and being otherwise fully advised in the premises, for the reasons stated below, it is respectfully recommended that the Motion to Suppress (DE 29) be **DENIED**.

### I.    FACTUAL BACKGROUND

On February 6, 2025, a Grand Jury sitting in the Southern District of Florida returned a three-count Superseding Indictment against Defendant (DE 51).  In Count One, Defendant is charged with Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*id.*).  In Count Two, Defendant is charged with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States

_____

[1] This Motion was referred to the undersigned Magistrate Judge for a Report and Recommendation on January 23, 2025 (DE 33).

Code, Section 924(c)(1)(A)(i) (*id.*).  In Count Three, Defendant is charged with Possession of a Firearm by a Convicted Felon, in violation of Title 18, United States Code, Section 922(g)(1) (*id.*).

In July 2022, law enforcement began investigating a series of events targeting Victim 1 and Victim 2 between 2019 and September 2023, including an alleged poisoning, two vehicle arsons, a hit and run, and the mailing of a threatening letter (DE 29-1 at 4).  The investigation revealed that Victim 1's estranged husband implored a group of individuals to harass and target Victim 1 (*id.* at 5).  Four individuals were charged in connection with the investigation (*id.*).

On June 23, 2024, at approximately 11:30 a.m., Victim 1 was the subject of another assault (*id.*).  Specifically, Victim 1 was inside a car in the driveway of her house, when a black male ("Subject 1") ran toward her brandishing a firearm (*id.* at 5-6).  Attempting to flee, Victim 1 drove the car into her backyard and continuously engaged the car's horn (*id.* at 6).  Subject 1, who is not alleged to be Defendant, initially ran into the backyard on foot and then turned around and ran to the front of the house (*id.*).  Victim 3, who had been inside, ran toward the front of the house after hearing the commotion (*id.*).  Subject 1 ran up behind Victim 3 and pointed a silver pistol at her head (*id.*).  Subject 1 grabbed Victim 3's arm and told her to get back inside the house, which she did (*id.*).  Subject 1 then ran across the yard and got into the back passenger side of a black Dodge Ram pick-up truck, which fled the area (*id.*).

The incident was captured on Victim 1's surveillance cameras (*id.*).  The cameras also showed the black Dodge Ram pick-up truck arrive in the area and park on the street next to Victim 1's residence (*id.*).  Law enforcement recovered additional video from nearby houses in the neighborhood (*id.* at 7).  These videos showed the black Dodge Ram pick-up truck arrived and parked on the north side of SW 96th Street, approximately one block east of Victim 1's house, at 8:46 a.m. (*id.*).  The videos further showed the black Dodge Ram pick-up truck followed closely

behind a white Tesla (*id.*).  The Tesla continued west on SW 96th Street, passing Victim 1's house (*id.*).  Less than two minutes later, the Tesla traveled east on SW 96th Street, passing Victim 1's house again and passing the black Dodge Ram pick-up truck (*id.*).  The black Dodge Ram pick-up truck then immediately departed and followed closely behind the Tesla, as both vehicles turned onto SW 67th Avenue (*id.*).  At approximately 8:56 a.m., the black Dodge Ram pick-up truck returned to the same spot at which it had previously parked and did not depart until Victim 1 arrived at the house around 11:30 a.m. (*id.* at 7-8).

The Tesla's license plate could be seen in the video—a Florida license plate with "DI0RI" on it (*id.* at 8).  The license plate was registered to Defendant, who was also a registered occupant of a house located at 2427 NW 131st Circle, Miami, Florida 33167 (*id.* at 3, 8).  The day after the incident at Victim 1's home, law enforcement conducted a spot check on Defendant's house (*id.* at 8).  They saw a Chevrolet Tahoe, bearing license plate "BN50WL," parked outside, which was also registered to Defendant (*id.*).  Law enforcement ran the Chevrolet Tahoe's license plate through a license plate reader database and received a commercial hit for the tag (*id.*).  The hit included a picture of the Chevrolet Tahoe parked next to a black Dodge Ram pick-up truck in front of Defendant's house on May 3, 2024 (DE 29-2).[2]

Based on this information, law enforcement applied for a search warrant of Defendant's home to attempt to locate (i) evidence of a crime, (ii) contraband, fruits of a crime, or other items illegally possessed, or (iii) property designed for use, intended for use, or used in committing a crime in conjunction with the target offenses of Murder for Hire, in violation of Title 18, United States Code, Section 1958, and Stalking, in violation of Title 18, United States Code, Section

---

[2] As described further below, the date on which the commercial hit depicted the Chevrolet Tahoe parked next to a black Dodge Ram pick-up truck in front of Defendant's house, that is May 3, 2024, was omitted from the affidavit in support of the search warrant.

2261A (DE 29-1 at 2).  A United States Magistrate Judge in the Southern District of Florida authorized the search warrant on June 24, 2024 at 6:50 p.m. (*id.* at 21).  Specifically, the search warrant permitted law enforcement to search Defendant's home and Defendant's person for firearms, garments matching Subject 1's clothing, particles that could include DNA, such as hair follicles, blood, skin tissue, saliva, or mucus, and electronic devices and storage media, of which the warrant also authorized a search, among other items (*id.* at 24-26).  Law enforcement executed the search warrant at Defendant's house at approximately 7:00 p.m. and recovered a silver 9mm pistol loaded with 12 rounds of ammunition, an AR-style rifle, a Glock 19 pistol loaded with 12 rounds of ammunition, hundreds of rounds of ammunition, and multiple bags containing what was later determined to be cocaine, methamphetamine, and fentanyl among other items (DE 1 at 4, DE 51 at 4).  Defendant was arrested and charged with the instant offenses.

## II.   LEGAL STANDARD

"The Fourth Amendment to the U.S. Constitution provides that 'no Warrants shall issue, but upon probable cause . . . .'  In order to obtain a warrant, police must establish that there is probable cause to believe they will find contraband or evidence at a particular location."  *United States v. Anderson*, 152 F. App'x 915, 917 (11th Cir. 2005) (citations omitted).  "Probable cause is 'not a high bar.' . . . This 'flexible and fluid concept' turns on examining all information together."  *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (citations omitted). "Probable cause to search a residence exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).  "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched."  *United States v.*

*Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). "We look to the face of a particular affidavit to evaluate whether the affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Anderson*, 152 F. App'x at 917.

## III.   **DISCUSSION**

Defendant filed the instant Motion to Suppress, challenging the search warrant authorizing the search of his home (DE 29). Defendant argues that the warrant fails to set forth probable cause for the search, the warrant contains material misrepresentations and/or omissions, and the good faith exception to the exclusionary rule does not apply. Defendant, in turn, requests that the Court suppress the evidence seized from the search of Defendant's home. The Government counters that the affidavit in support of the warrant sets forth sufficient facts to establish probable cause to search Defendant's home for evidence or instrumentalities of the target offenses (DE 47). The Government further argues that any omission from the warrant was not material, and the officers relied in good faith on the warrant when conducting the search of Defendant's home, which should negate suppression of the evidence recovered.

### A. The Search Warrant Contains Probable Cause to Search Defendant's Home.

Defendant argues that the search warrant lacks probable cause for several reasons (DE 29). First, Defendant claims that there are not sufficient facts to establish that the target offenses listed in the warrant—Murder for Hire and Stalking—occurred. Rather, Defendant asserts that there is only probable cause to believe that an assault with a firearm occurred, over which the Court does not have subject matter jurisdiction. Defendant next claims that no probable cause exists to believe Defendant was involved in the target offenses or that evidence of the target offenses would be located in Defendant's home.

i.    **The Search Warrant Established Probable Cause that Federal Offenses Occurred.**

Turning to the first argument, Defendant claims that the Magistrate Judge was "without jurisdiction to authorize the warrant for investigation of an offense against the State of Florida (assault with a firearm)" (DE 55 at 6).  Essentially, Defendant claims that the facts contained in the warrant failed to state probable cause for the federal offenses of Murder for Hire and Stalking. This argument, however, fails to employ the "realistic and commonsense approach" encouraged by the United States Court of Appeals for the Eleventh Circuit when assessing probable cause, "so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citations omitted).

In *Miller*, the defendant moved to suppress evidence resulting from a search, because "the search warrant affidavit failed to state probable cause of a federal offense inasmuch as the affidavit did not establish that the property destroyed by the arson was used in interstate or foreign commerce or in any activity affecting such commerce." *Id.* at 1359.  The Eleventh Circuit reversed the district court and found that "the search warrant affidavit assert[ed] sufficient factual information about the business nature of appellees' former premises to allow the issuing magistrate to reasonably conclude that federal jurisdiction was proper . . . ." *Id.* at 1363.  Specifically, in reviewing the affidavit in support of the warrant, there was "an orderly, logical progression from initially establishing commercial activity to ultimately asserting probable cause under [the federal arson statute] . . . that, as a matter of law, . . . is factually sufficient to establish probable cause of a federal crime." *Id.* at 1362.  The Eleventh Circuit further noted, "The district court demands of both the special agent and the issuing magistrate a hypertechnical specificity that is not in keeping

either with the legislative history of [the federal arson statute] or with the 'practical, commonsense' standard of preparing and reviewing search warrant affidavits as espoused in *Gates*." *Id.*

The search warrant in this case seeks to locate evidence of Murder for Hire and Stalking. The federal crime of Murder for Hire, in violation of Title 18, United States Code, Section 1958, "prohibits a person (1) from traveling in or causing another to travel in interstate or foreign commerce, or using or causing another to use any facility of interstate or foreign commerce, (2) 'with intent that a murder be committed in violation of the laws of any State or the United States,' (3) in return for a promise or agreement to pay anything of pecuniary value." *United States v. Buselli*, 106 F.4th 1273, 1282-83 (11th Cir. 2024) (emphasis omitted). Stalking, in violation of Title 18, United States Code, Section 2261A, occurs where:

> (1) [A defendant] travels in interstate or foreign commerce . . . with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that—
>
> > (A) places that person in reasonable fear of the death of, or serious bodily injury to—
> >
> > > (i) that person; . . .

18 U.S.C. § 2261A(1)(A)(i). "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citation omitted). The undersigned first addresses whether there was probable cause to believe the federal offenses of Murder for Hire and Stalking had been committed.

A common sense, practical reading of the affidavit supports the conclusion that the June 23, 2024 incident, where Subject 1 approached Victim 1 brandishing a firearm, was part of an on-going Murder for Hire and Stalking plot targeting Victim 1. Paragraphs five, six, and seven of the

affidavit describe a series of events, beginning in 2019 and continuing through September 26, 2023, where Victim 1's estranged husband organized a "coordinated effort . . . to harass and target" Victim 1, including working with four individuals to commit arsons and a hit and run, after following Victim 1 from a divorce proceeding (DE 29-1 at 4-5). The hit and run, which occurred on August 30, 2023, involved the assailants ramming a Home Depot rental truck into the side of Victim 1's car and then fleeing the scene (*id.* at 5). Two of the individuals who carried out these acts admitted to law enforcement that they were targeting Victim 1 on behalf of her estranged husband (*id.*). After laying out this plot, the affidavit then describes the assault on June 23, 2024 (*id.*). Considering the June 23, 2024 assault occurred less than a year after the hit and run, targeted the same victim, and was another violent and threatening act, the Magistrate Judge could have reasonably concluded that it was another attempt to target Victim 1 in the plot organized by Victim 1's estranged husband. *See Delgado*, 981 F.3d at 897 ("The mere 'probability or substantial chance of criminal activity' is all that is needed." (citation omitted)).

At the February 12, 2025 hearing, Defendant argued that the individuals and events described in paragraphs five, six, and seven were part of an "unrelated investigation" or "perhaps related somehow . . . that [the Government does] not explain." But, it defies logic that the Government included detailed information about a completely unrelated investigation in the affidavit for no apparent reason. *See id.* ("[I]n considering probable cause, we do not isolate events, but consider the 'totality of the circumstances' . . . ." (citation omitted)). The Government argued that the June 23, 2024 incident was the continuation, or escalation, of the pattern of events starting with the alleged harassment described in paragraphs five, six, and seven. Indeed, after reading the affidavit as a whole, the Magistrate Judge could have reasonably concluded that the June 23, 2024 incident was the most recent attempt to harm Victim 1 in the Murder for Hire and

Stalking plot, where the previous attempts made against Victim 1 were unsuccessful.  *See United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (finding reviewing courts "must 'take care . . . to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" (citation omitted)).  Nor is the undersigned persuaded that using the header "The Assault with a Firearm on June 23, 2024" to describe the June 23, 2024 incident undermines the reasonable association between the June 23, 2024 incident and the Murder for Hire plot described in the preceding paragraphs.  Such a reading of the affidavit would require the type of hyper-technical review that the Eleventh Circuit counsels against.  *See Miller*, 24 F.3d at 1361 ("[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" (citation omitted)).  In sum, the search warrant set forth sufficient facts to show the federal offenses of Murder for Hire and Stalking, underscoring the Court's subject matter jurisdiction to issue the warrant.  *See United States v. Evans*, No. 05-CR-159, 2006 WL 2221629, at *15 (M.D. Fla. Aug. 2, 2006) ("[T]he determination of the existence of jurisdiction is but part and parcel of the determination of whether probable cause exists to believe that evidence of a *federal* crime may be present in the location to be searched." (emphasis in original)).

ii.    <strong>The Nexus Between the Target Offenses and the Search of Defendant's Home.</strong>

Next, Defendant claims that the search warrant lacks sufficient facts to show any connection between the target offenses and Defendant or Defendant's home (DE 29).  To authorize the search of a residence, "the affidavit must contain 'sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched.'" *Martin*, 297 F.3d at 1314 (citation omitted).  "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the

9

residence and any criminal activity." *Id.* (citation omitted).  However, "[t]he affidavit need not allege that any illegal activity occurred at the residence." *United States v. Gladden*, No. 23-11946, 2024 WL 3373702, at *7 (11th Cir. July 11, 2024) (citing *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009)).

Here, the Government relies primarily on the following evidence to establish probable cause to search Defendant's home.  After brandishing the firearm to Victim 1 and Victim 3, Subject 1 got into the back passenger side of a black Dodge Ram pick-up truck and fled the area, which was captured on video (DE 29-1 at 6).  Law enforcement recovered additional videos in the area from the day of the incident, which showed the black Dodge Ram pick-up truck arrived and parked on the north side of SW 96th Street, approximately three hours before Victim 1 arrived (*id.* at 7).  The videos further showed the black Dodge Ram pick-up truck followed closely behind a white Tesla, which was registered to Defendant and had a Florida license plate with Defendant's first name on it (*id.*).  The Tesla continued west on SW 96th Street, passing Victim 1's house (*id.*).  Less than two minutes later, the Tesla traveled east on SW 96th Street, passing Victim 1's house again and passing the black Dodge Ram pick-up truck (*id.*).  The black Dodge Ram pick-up truck then immediately departed and followed closely behind the Tesla, as both vehicles turned onto SW 67th Avenue (*id.*).  Approximately ten minutes after it was initially seen on the video, the black Dodge Ram pick-up truck returned to the same spot at which it had previously parked and did not depart until Victim 1 arrived (*id.* at 7-8).

In addition to the video evidence, law enforcement located Florida Power and Light records for Defendant's home upon learning the white Tesla was registered to him (*id.* at 8).  The records showed that the power and electric bill for Defendant's home were in Defendant's name from November 2022 until the date of the warrant (*id.*).  The day after the incident, law enforcement

conducted a spot check on Defendant's house (*id.*).  They saw a Chevrolet Tahoe, bearing license plate "BN50WL," parked outside, which was also registered to Defendant (*id.*).  Law enforcement ran the Chevrolet Tahoe's license plate through a license plate reader database and received a commercial hit (*id.*). The hit included a picture of the Chevrolet Tahoe parked next to a black Dodge Ram pick-up truck in front of Defendant's house, which was consistent with the pick-up truck in which Subject 1 fled (*id.*).

The affidavit further discusses the affiant's, who has been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2021, familiarity with methods used by the criminal element to further a variety of criminal activities, based on his training and experience.  The affiant notes, after reviewing the videos showing the white Tesla and the black Dodge Ram pick-up truck on the morning of June 23, 2024, "[b]ased on the proximity of [the black Dodge Ram pick-up truck and the white Tesla] over time, distance, and consistent change of direction, this likely indicates a direct relationship between the occupants of [the black Dodge Ram pick-up truck] and the occupant(s) of [the white Tesla]" (*id.* at 8).  Moreover, the affiant states,

> Based upon my training and experience, I [sic] that individuals who participate in murder-for-hire plots and stalking often use cellphones and other electronic devices to communicate with other co-conspirators.  I also know, based upon my training and experience, that participants in crimes such as murder-for-hire and stalking often keep weapons and other items used to commit their crimes in safe and secure places, such as their homes.  For example, I have seen criminals keep weapons, clothing used to commit the crimes, masks, and gloves used in the commission of the crimes at their residences.  I also know, based upon my training and experience, that participants in murder-for-hire and stalking crimes oftentimes keep notes, or documents reflecting payment for the crimes or location information about the intended victim.

(*Id.*).  Based on this information, the warrant requests authorization to search Defendant's home for evidence related to the Murder for Hire and Stalking plot, targeting Victim 1.

The Government argues that the video recovered by law enforcement suggests that the occupants of the black Dodge Ram pick-up truck and the occupant, or occupants, of the white Telsa were working in concert to canvass Victim 1's house prior to her arrival (DE 47).  In fact, the FBI Special Agent avers that there is "a direct relationship" between the black Dodge Ram pick-up truck and the white Tesla based on what appears to be coordinated movements in the video (DE 29-1 at 8).  The Government contends that the relationship between the black Dodge Ram pick-up truck and the white Tesla is further established by the commercial hit from the license plate reader database, showing a black Dodge Ram pick-up truck, consistent with the pick-up truck involved in the June 23, 2024 incident, parked outside of Defendant's residence (*id.*).  These facts, according to the Government, establish probable cause to believe the occupant, or occupants, of the white Tesla were involved in the June 23, 2024 incident (*id.*).  The white Tesla was registered to Defendant, and Defendant's first name is displayed on the license plate (*id.*).  Additionally, Defendant's name is on the power and electric bill for the address law enforcement requested to search in June 2024, leading to a reasonable inference that Defendant, the registered owner of the white Tesla, lived at the residence on June 23, 2024 (*id.*).  Relying on his training and experience, the FBI Special Agent stated that individuals who engage in crimes, such as Murder for Hire and Stalking, often use cellphones and electronic devices to communicate with co-conspirators and keep evidence of their crimes, such as weapons, clothing used to commit the crimes, and documents related to the crimes, in secure places, like their homes (*id.*).

The facts contained within the affidavit, when considered in their totality, are sufficient to establish probable cause to believe Defendant's home contained evidence of the June 23, 2024 assault on Victim 1, as part of the Murder for Hire and Stalking plot.  The videos depicting the black Dodge Ram pick-up truck's and the white Tesla's movements prior to the assault in

conjunction with the information from the license plate reader database would have permitted the Magistrate Judge to conclude that the occupant, or occupants, of the white Tesla were likely co-conspirators. Defendant counters that there is no evidence that he was in the vehicle on the day of the assault. While it is true that the Government did not put forth conclusive evidence that Defendant drove, or was otherwise in, the white Tesla, the evidence linking the white Tesla to Defendant was significant, particularly where his name appeared on the registration and the license plate of the vehicle. *See Delgado*, 981 F.3d at 897 ("Nothing even approaching 'conclusive proof or proof beyond a reasonable doubt' is required [for a probable cause determination]." (citation omitted)).

Having established that there were sufficient facts to determine the car linked to Defendant was involved in the assault, Defendant asserts that the affidavit did not provide a nexus between the Tesla's involvement in the assault and a reasonable belief that evidence of the assault could be located in Defendant's home (DE 29). The Government argues that the FBI Special Agent's training and experience regarding conspirators' use of cellphones and tendency to keep instrumentalities of their crimes in secure places, like their homes, provides the necessary link to find a fair probability that Defendant, the owner of the Tesla used to facilitate the assault on Victim 1, kept evidence of the assault in his home (DE 47). Defendant counters that these conclusory opinions from the FBI Special Agent cannot establish probable cause (DE 55).

Defendant points to *United States v. Griffith*, arguing in that case, the officer's assertion that "gang members 'maintain regular contact with each other' and 'often stay advised and share intelligence about their activities through cell phones and other electronic communication devices and the Internet'" was insufficient to establish probable cause to search the defendant's residence. 867 F.3d 1265, 1274 (D.C. Cir. 2017). In *Griffith*, however, the D.C. Circuit found that "the

13

affidavit in this case conveyed no reason to think that [the defendant] . . . owned a cell phone," and that "the phone was 'likely to be found at the place to be searched.'" *Id.* at 1272-73.  With respect to the officer's statement about gang members' use of cell phones in his training and experience, the D.C. Circuit took issue with the time that elapsed between the warrant and the target offense, not the officer's statement based on his experience.  In fact, the D.C. Circuit stated,

> That assessment ["that, in the affiant's experience, gang members 'maintain regular contact with each other" and "often stay advised and share intelligence about their activities through cell phones and other electronic communication devices and the Internet'"] might have added force if officers had been investigating a more recent crime. Because the information on a cell phone can enable reconstruction of the 'sum of an individual's private life,' the police often might fairly infer that a suspect's phone contains evidence of recent criminal activity, perhaps especially when, as here, multiple perpetrators may have coordinated the crime. But by the time police sought the warrant in this case, more than a year had elapsed since the shooting.

*Id.* at 1274 (citation omitted).  In any event, the affidavit in *Griffith* failed to provide any connection between the defendant, the evidence believed to be in the residence, that is a cellphone, and facts showing the cellphone contained evidence of the crime.  *Id.* at 1272-73.

Unlike *Griffith*, the affidavit in this case connected the assault to the white Tesla, the white Tesla to Defendant, and Defendant to his home, where he is likely to keep instrumentalities of the crimes.  Moreover, the Eleventh Circuit has recognized, "[E]vidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence." *Jenkins*, 901 F.2d at 1080-81.  The FBI Special Agent's training and experience, demonstrating that conspirators engaged in the target offenses typically use cellphones to communicate and tend to keep instrumentalities of their crimes, like firearms, in their homes, supported probable cause, where, as here, there was a firearm used in the assault and multiple

conspirators, who needed to communicate with each other, were involved.[3]  *See United States v. Leach*, 498 F. App'x 915, 917 (11th Cir. 2012) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation." (citing *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995)).   The FBI Special Agent's opinions, in conjunction with the other facts, established a fair probability that: (i) the conspirators communicated in planning the assault and coordinating their movements, and a conspirator's cellphone could be located on his person[4] or at his home; and (ii) the firearm, clothing, or other instrumentalities of the assault could be located in a conspirator's home.  *See Jenkins*, 901 F.2d at 1081 (holding "the combination of a finding of probable cause that [the defendant] committed the theft, the fact that the contraband stolen was composed of items which are capable of being hidden in a residence, and the statement of an agent who had ten years' experience investigating bank robberies provided sufficient probable cause to justify a search of [the defendant's] home.").

Considering the foregoing, the affidavit contained sufficient facts and information to find probable cause to authorize the search of Defendant's home.  In reaching this conclusion, the undersigned is mindful of the Eleventh Circuit's guidance that a Magistrate Judge's probable cause "determination is to be given great deference and is conclusive, if reasonable, absent arbitrariness." *United States v. Sweeting*, 933 F.2d 962, 964 (11th Cir. 1991) (citations omitted).

> In particular, issuing magistrates are given the unenviable task of making 'firing line' decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.  In recognition of the difficulty inherent in discharging this

---

[3] The video showed that Subject 1 got into the back passenger seat of the black Dodge Ram pick-up truck, suggesting that at least one other individual had to be in the pick-up truck to drive away, in addition to a third individual driving the white Tesla (DE 29-1 at 6).

[4] The search warrant also authorized a search of Defendant's person for evidence of the target offenses, as more particularly described in Attachment B (*id.* at 23).

responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

*Miller*, 24 F.3d at 1363. "Indeed, a '[judge's] finding of probable cause should be sustained in doubtful or marginal cases." *United States v. Woods*, No. 11-CR-60204, 2011 WL 5574863, at *4 (S.D. Fla. Nov. 3, 2011) (quoting *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977)). The necessity of this guidance is particularly apparent in a rapidly evolving investigation where the target offenses involve an imminent threat to human life, such as the instant matter.

### B. The Search Warrant Does Not Contain Material Misrepresentations or Omissions that Negate Probable Cause.

Defendant also claims that the search warrant affidavit contained material omissions, such that the Magistrate Judge would not have issued the warrant had she known the missing information (DE 29). Defendant further claims that he is entitled to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 15 (1978), because the omissions were made with reckless disregard for the truth (*id.*). Defendant identified the following omissions and misrepresentations in the affidavit at the February 12, 2025 hearing: (i) the omission of the date and time of the photograph from the license plate reader database,[5] (ii) the omission that the black Dodge Ram pick-up truck was recovered near Victim 1's residence on June 24, 2024, (iii) the omission that law enforcement saw the white Tesla driven by an unidentified female in another part of the county on June 24, 2024, and (iv) the FBI's Special Agent's incorrect conclusion that "[b]ased on the proximity of [the black Dodge Ram pick-up truck and the white Tesla] over time, distance, and consistent change of direction, this likely indicates a direct relationship between the occupants of [the black

---

[5] Defendant argued at the February 12, 2025 hearing that the photograph itself from the license plate reader database was also omitted; yet, after further inquiry, defense counsel stated that the only pertinent information omitted was the date and time.

Dodge Ram pick-up truck] and the occupant(s) of [the white Tesla]" (DE 29-1 at 8).[6]

"We must begin with the understanding that affidavits supporting arrests warrants are presumptively valid." *United States v. Gamory*, 635 F.3d 480, 490 (11th Cir. 2011) (citation omitted). When a defendant challenges the validity of a search warrant, the defendant must make "a substantial preliminary showing that a false statement was included in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth." *Id.* "To obtain a *Franks* hearing, a defendant must not only show that the affiant made false statements or omissions 'intentionally or with reckless disregard for the truth,' but also that the false statements or omissions were 'necessary to the finding of probable cause.'" *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021) (citation omitted). "If . . . probable cause still exists once the false statement is removed from the warrant, there is no need to hold a *Franks* hearing. . . . The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would have been lacking.'" *Gamory*, 635 F.3d at 490 (citations omitted).

Defendant has not made the substantial preliminary showing necessary to warrant a *Franks* hearing. First, Defendant has not shown that the omissions and alleged misrepresentation were made intentionally or with reckless disregard for the truth. At the February 12, 2025 hearing, Defendant argued that the FBI Special Agent's failure to include the date and time of the photograph from the license plate reader database was reckless, because an experienced, trained FBI Agent should know that the date of the photograph was a very important piece of information, given the supposedly thin probable cause for the warrant. Defendant did not make any additional

---

[6] In the Motion to Suppress, Defendant alludes to other misrepresentations or omissions, particularly related to the video of the black Dodge Ram pick-up truck and the white Tesla (DE 29). However, at the February 12, 2025 hearing, Defendant stated there were no misrepresentations in the affidavit about the description of what is depicted in the video, and the four statements above represent all of Defendant's challenges to the affidavit.

showings of falsity or reckless disregard for the truth regarding the other omissions.  With respect to the FBI Special Agent's opinion that there was a direct relationship between the black Dodge Ram pick-up truck and the white Tesla in the video, Defendant simply states that the opinion is inaccurate.  The Government acknowledges that the FBI Special Agent knew the date of the photograph from the license plate reader database when the warrant was submitted but omitted it unintentionally.  According to the Government, "it was a proof-reading error" (DE 47 at 6).

Paragraph 13 of the affidavit, which describes the discovery of the photograph from the license plate reader database states:

> On June 24, 2024, a spot check was conducted on [Defendant's home].  Parked outside was a Chevrolet Tahoe, bearing Florida license plate BN50WL.  This Tahoe is also registered to [Defendant].  A review of a license plate reader database for the Tahoe's plate revealed a commercial hit for the tag at [Defendant's home].  Parked next to the Tahoe, at [Defendant's home], was a black Dodge Ram with chrome bumpers, similar in description to the [the black Dodge Ram pick-up truck involved in the assault].

(DE 29-1 at 8).  Defendant argues that this paragraph suggests the photograph of the black Dodge Ram parked outside of Defendant's house was taken on June 24, 2024 (DE 29).  Defendant's reading of paragraph 13, which could be described as unartfully drafted, is understandable.  The Government clarifies that the spot check of Defendant's home occurred on June 24, 2024, at which law enforcement observed the license plate of the Tahoe and discovered the photograph from the database, but the photograph was taken on May 3, 2024—a fact that was omitted from the affidavit (DE 47).

There is no dispute that the FBI Special Agent knew the May 3, 2024 date of the license plate reader photograph when the search was submitted and that the date was omitted from the affidavit.  However, past simply arguing that the information should have been included because it was important, and the FBI Special Agent should have known better, Defendant proffers no facts

regarding this omission.  These conclusory statements do not suffice to require an evidentiary hearing under *Franks*:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006) (citing *Williams v. Brown*, 609 F.2d 216, 219 (5th Cir. 1979) (quoting *Franks*, 438 U.S. at 171)).  No such offer of proof regarding any of the alleged omissions or misrepresentations has been advanced.  Moreover, for an omission to be made with reckless disregard, as Defendant alleges here, "the information omitted is the kind of information that a reasonable person would expect a judge to want to know."  *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1369 (S.D. Fla. 2008) (citation omitted).  Defendant offered no basis for the undersigned to conclude that the FBI Special Agent's failure to include the date of the photograph, or any of the other omissions, were so "*clearly critical* to a finding of probable cause [that] the fact of recklessness may be inferred from proof of the omission itself."  *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (emphasis added) (citation omitted).  To the contrary, the omission of the date was more akin to negligence in light of the relevance of the photograph, as previously described.  *See id.* ("Omissions that are not reckless, but are instead negligent, . . . or insignificant and immaterial, will not invalidate a warrant." (citation omitted)).  And simply disagreeing with the affiant's opinion regarding a conclusion he draws from the video does not demonstrate an intentional or reckless misrepresentation, or any misrepresentation at all.  *See United States v. Haimowitz*, 706 F.2d 1549, 1556 (11th Cir. 1983) (rejecting argument that

affiant misled the court where defendant only offered "conclusory allegations unsupported by an offer of proof").

Second, even if the omissions Defendant points to were included in the warrant, there would still be probable cause to search Defendant's home. Defendant asserts that if the affidavit made clear that the photograph showing the black Dodge Ram pick-up truck parked outside of Defendant's house was taken on May 3, 2024, approximately seven weeks prior to the assault, this evidence would have been stale and dissipated any probable cause to believe there was a connection between the black Dodge Ram pick-up truck used in the assault and Defendant's home (DE 29). But, this argument fundamentally misconstrues the import of the photograph. The significance of this photograph *is not* to show that evidence of the target offenses would likely be located in Defendant's home at the time because the same black Dodge Ram pick-up truck used in the offense was parked there a day later.[7]  Instead, the significance of the photograph is that it

---

[7] As explained *infra*, the nexus between the target offenses and the probability that evidence of those offenses is located in Defendant's home is not established by the photograph of the black Dodge Ram pick-up truck parked in front of Defendant's home. Rather, it is established by the white Tesla's involvement in canvassing Victim 1's house a few hours prior to the assault, the white Tesla's connection to Defendant, Defendant's connection to the home, and the FBI Special Agent's training and experience that assailants typically keep instrumentalities of the target offenses in their homes. Since the white Tesla was seen interacting with the co-conspirators' vehicle on the same day as the offense, and the Government applied for the search warrant the following day, there is no issue with the staleness of the information in the affidavit. *See United States v. Arwood*, No. 20-14847, 2022 WL 202541, at *3 (11th Cir. Jan. 24, 2022) ("The information supporting the government's application for a warrant must not be stale, meaning it 'must show that probable cause exists at the time the warrant issues.'" (citation omitted)).

Even if the May 3, 2024 photograph did not strengthen the relevant inferences, the undersigned would not find that the photograph was stale for purposes of probable cause. *See United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000) ("In addition to the length of time, courts should consider the 'nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched.'").

supports the inference that the occupant, or occupants, of the white Tesla were involved in the target offenses.  The photograph helps demonstrate that it was not merely a coincidence that the black Dodge Ram pick-up truck and the white Tesla were seen on the video together hours prior to the assault.  It is a further connection between the two vehicles to suggest their occupants were working in concert with each other.  Viewing the significance of the photograph in this manner, the Government correctly points out that the fact that the photograph was taken approximately seven weeks earlier actually *strengthens* the inference, as opposed to undercutting it.  The Murder for Hire and Stalking plot is a continuing offense that involved organization and planning between the co-conspirators.  The black Dodge Ram pick-up truck depicted at Defendant's home seven weeks prior to the assault suggests that Defendant was working with the co-conspirators well before June 23, 2024.  Therefore, the inclusion of the May 3, 2024 date of the photograph depicting a black Dodge Ram pick-up truck, which is consistent with the vehicle in which Subject 1 fled, at Defendant's home does not negate the probable cause.

Similarly, including the facts that the black Dodge Ram pick-up truck was recovered near Victim 1's residence on June 24, 2024 and that law enforcement saw the white Tesla driven by an unidentified female in another part of the county on June 24, 2024, does not negate the probable cause in the search warrant.  As discussed above with respect to the photograph, the fact that the black Dodge Ram pick-up truck was not at Defendant's home the day after the assault but instead, was recovered after being abandoned near Victim 1's house does not adversely impact the logical connection set forth in the warrant between the assault and the potential for evidence to be located

---

The facts in the affidavit show that the Murder for Hire and Stalking plot occurred over a series of years, the items sought would likely be found in the home, even several weeks after the photograph, and Defendant appeared to reside at the home between May 2024 and the date of the assault, based on the power and electric bills.

in Defendant's home.  Further, the significant evidence connecting Defendant to the white Tesla is not substantially diminished by the fact that law enforcement observed another individual driving the white Tesla the day after the assault in another part of the county.  Since the addition of the omitted material does not disturb the probable cause in the warrant to search Defendant's home, and there were no material misrepresentations, Defendant is not entitled to an evidentiary hearing under *Franks* or suppression of the evidence recovered from the search.

### C.  Even if the Search Warrant Was Deficient, the Good Faith Exception to Suppression Applies.

Even if the search warrant lacked probable cause to search Defendant's home, the good faith principle set forth in *United States v. Leon*, 468 U.S. 897 (1984), counsels against suppression.  "[*Leon*] stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause."  *Martin*, 297 F.3d at 1313.  The Eleventh Circuit has recognized four circumstances where the good faith principle does not apply:

> (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Id.* (citation omitted).  "The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in 'objectively reasonable law enforcement activity' and have acted in good faith when obtaining a search warrant from a judge or magistrate, the *Leon* good faith exception applies."  *Id.* (citation omitted).

Defendant claims that two of the *Leon* exceptions apply here—the FBI Special Agent omitted material information with reckless disregard for the truth and the warrant was so devoid of probable cause that any reliance on it by law enforcement was entirely unreasonable (DE 29). Defendant relies on his previous arguments, particularly in relation to the absence of probable cause and the FBI Special Agent's omission of the photograph's date from the license plate reader database, to assert that applying the *Leon* principle in this case would "vitiate the punitive and corrective effect of the exclusionary rule" (*id.* at 25).   The Government argues that law enforcement acted in good faith and in reasonable reliance on the warrant, so there is no basis to find that the *Leon* principle does not apply to the evidence recovered in the search of Defendant's home (DE 47).

As previously set forth, there is no basis to conclude that the FBI Special Agent acted with reckless disregard for the truth when he omitted the date of the photograph from the affidavit.  And the affidavit possessed "reasonable indicia of probable cause," such that any officer who relied on the warrant as valid was not acting in an entirely unreasonable manner.  *United States v. Martinez-Martinez*, 777 F. App'x 441, 446 (11th Cir. 2019) ("Asking 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization,' . . . we see nothing in the record that would so indicate." (citation omitted)); *see also United States v. Contreras Rodriguez*, 291 F. App'x 989, 992 (11th Cir. 2008) ("Because the affidavit contained at least some information suggesting evidence might be found at [the defendant's] residence, the executing officers could have reasonably believed the warrant was supported by probable cause."). Moreover, law enforcement obtained the search warrant the day after the assault in a fast-moving investigation of violent offenses that indicated Victim 1 was the target of a years-long plot to kill

her.[8]  Under these circumstances, even if the warrant lacked sufficient probable cause to authorize the search of Defendant's home, the *Leon* principle precludes exclusion of the evidence.

### IV.    CONCLUSION

Based on the foregoing, it is respectfully recommended that Defendant's Motion to Suppress (DE 29) be **DENIED**.

### V.    OBJECTIONS

The Parties will have **five (5) days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.[9] Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the Parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if necessary, in the interest of justice.  *See* 28 U.S.C. § 636(b)(1) (2009); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 22nd day of February, 2025.

_____
ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc:    All Counsel of Record

---

[8] In the reply, Defendant attached a Complaint charging three individuals that were involved in the August 30, 2023 hit and run and arsons targeting Victim 1 (DE 55).  The Complaint details the investigation into these individuals and was signed in March 2024 by the same Magistrate Judge who issued the search warrant in this case.

[9] Due to the upcoming trial date, the undersigned has shortened the objection period to five (5) days in accordance with Southern District of Florida Local Rule for Magistrate Judges 4(b).  At the February 12, 2025 hearing, the Parties agreed to a three-day objection period; however, due to a brief continuance of the trial, the undersigned extended the objection period to five (5) days.